**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eskandar Khamooshpour, | No. CV-10-01266-PHX-NVW |
| Plaintiff, | **FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER** |
| vs. | |
| Eric H. Holder, Jr. et al., | |
| Defendants. | |

Plaintiff is before the Court seeking *de novo* review, pursuant to 8 U.S.C. §1421(c), of the March 9, 2010 decision of the United States Customs and Immigration Services ("USCIS") denying his application for naturalization. The Court conducted an evidentiary hearing on Plaintiff's application on January 26 and 27, 2011. This order states the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.    Findings of Fact**

As a preliminary matter, the Court notes that it found all of Mr. Khamooshpour's character witnesses to be credible. The Court found Mr. Khamooshpour to be somewhat credible, although at times his testimony was evasive and strained credulity. To the extent any of the Court's findings below diverge from any aspect of Mr. Khamooshpour's testimony, that is reflective of this credibility determination.

**A.      Biographical Information and Procedural History**

Plaintiff Eskandar Khamooshpour is a citizen and national of Iran.   He has been a permanent legal resident of the United States since December 14, 1981.  He has a bachelor's degree in physics from the National University of Iran.  Mr. Khamooshpour first came to the United States in 1978 on a teaching scholarship and to pursue graduate studies in physics, first in Boston and then in New York.  In New York, he met Enid Feld, a United States citizen, whom he later married on July 29, 1980.  They were separated in 1983, and the marriage was dissolved upon Ms. Feld's death from Hodgkin's disease on September 19, 1984.

Mr. Khamooshpour moved to Arizona in December 1993.  Beginning in 1994, his full-time occupation was operating a family-owned business that facilitated channeling funds between the United States and Iran, although Mr. Khamooshpour reported sporadic involvement in the business prior to 1994.  In 2001, Mr. Khamooshpour was arrested on federal charges related to the operation of the business.  Mr. Khamooshpour has been involved in the real estate business full-time since 2002.  He currently owns two rental properties and serves as a landlord.  Mr. Khamooshpour has traveled outside of the United States several times since he first arrived here in 1978, but in the five years prior to filing his naturalization application, Mr. Khamooshpour did not travel outside of the United States. Mr. Khamooshpour also reported involvement with the American Iranian Council from 1994 to 2001, an organization promoting positive relations between the United States and Iran.

Mr. Khamooshpour married Somahyeh Doukhtehchizadehazimi, a citizen of Iran, in a religious ceremony during a trip to Turkey in 1998.  The marriage was not consummated at that time, and it is unclear whether the marriage was legally recognized in Iran. Ms. Doukhtehchizadehazimi arrived in the United States on February 6, 2006.  She and Mr. Khamooshpour were legally married in Scottsdale, Arizona, on July 28, 2006.  Ms. Doukhtehchizadehazimi was residing in the United States on an F-1 student visa at the time of Mr. Khamooshpour's naturalization application; her application for permanent residency is currently pending.

1      Mr. Khamooshpour filed an application for naturalization with the USCIS on February

2  26, 2007.  On his application, he reported his past history with law enforcement, including

3  a 2007 conviction stemming from his arrest for crimes related to his family's money

4  exchange business.  His application otherwise showed his eligibility for naturalization.  On

5  April 3, 2009, the USCIS requested additional information from Mr. Khamooshpour

6  regarding the crimes and conviction listed on his application.  Mr. Khamooshpour appeared

7  before an adjudications officer for an examination in connection with his naturalization

8  application on August 18, 2009.  The USCIS determined that Mr. Khamooshpour could not

9  establish the requisite good moral character necessary for naturalization because of his

10  conviction in 2007 for the crimes underlying his 2001 arrest.  Accordingly, the USCIS denied

11  his naturalization application on August 25, 2009.   On September 24, 2009, Mr.

12  Khamooshpour filed a request for a hearing on the USCIS decision.  He appeared before an

13  adjudications officer on November 18, 2009, but his application was again denied on March

14  9, 2010 because the USCIS concluded his conviction during the statutory period barred Mr.

15  Khamooshpour from establishing the good moral character requisite for naturalization.

16      Mr. Khamooshpour sought judicial review of the USCIS's final decision pursuant to

17  §310(c) of the Immigration and Naturalization Act ("INA") and 8 U.S.C. §1421(c) on June

18  15, 2010.  On January 26 and 27, 2011, this Court held a *de novo* evidentiary hearing

19  regarding Mr. Khamooshpour's naturalization application, wherein Mr. Khamooshpour

20  presented evidence of his good moral character.

21      **B.**    **2007 Conviction**

22      The primary factor relevant to Mr. Khamooshpour's good moral character

23  determination is his 2007 conviction for crimes related to his family-owned money exchange

24  business.  As part of this business, Mr. Khamooshpour assisted customers in channeling

25  funds between Iran and the United States.  Mr. Khamooshpour did not have a license to

26  facilitate these transactions, although he conducted his business openly and advertised in

27  Iran.  Over the course of the business's operation, Mr. Khamooshpour facilitated the

28  exchange of nearly thirty million dollars between Iran and the United States.   Mr.

1    Khamooshpour maintained financial accounts in Iran related to the business, which he

2    unlawfully failed to report to the United States.

3          On September 13, 2001, Mr. Khamooshpour was indicted and charged with numerous

4    federal crimes related to his operation of his family's money exchange business, totaling 285

5    counts.  Mr. Khamooshpour was arrested on these charges on October 5, 2001; he was

6    detained until December 11, 2001.  On July 19, 2004, Mr. Khamooshpour pled guilty to two

7    counts of the superseding indictment: 1) violation of the  Emergency Economic Powers Act

8    (hereinafter "the Embargo Act"), 50 U.S.C. §§ 1701, 1702, 1704, 1705(b), and 31 C.F.R.

9    560.201, 561.204, and 561.206; and 2) failure to report foreign financial accounts, 31 U.S.C.

10   §§ 5314 and 5322(b), and 31 C.F.R. 103.24.  Both counts are classified as Class C felonies.

11   Mr. Khamooshpour also forfeited certain assets as part of his plea agreement.

12         In the presentence investigation report, Mr. Khamooshpour acknowledged that he was

13   aware it was necessary to have a license from the United States Treasury Department Office

14   of Foreign Asset Control to conduct his business, that he had not obtained a license, and that

15   he knew operating his business without such a license was unlawful.  Mr. Khamooshpour

16   also stated that while he believed all of the money exchanges he facilitated were for non-

17   commercial purposes, he did not ask his customers for what purpose they were planning to

18   use the money.  He acknowledged that he did not take any steps to verify the identify of his

19   customers or how they ultimately used the funds he helped them exchange.  Finally, Mr.

20   Khamooshpour acknowledged that in order to operate his business, he maintained a bank

21   account in Iran and that he unlawfully failed to report this account to the United States,

22   although he claims that his failure to report the account was simply an oversight because it

23   had not occurred to him that an account in Iran was "foreign."

24         Although Mr. Khamooshpour was charged with crimes which occurred between 1997

25   and 2001, arrested in 2001, and reached a plea agreement in 2004, the judgment in his case

26   was not entered until June 19, 2007. Mr. Khamooshpour's cooperation with ongoing

27   investigations caused the three-year delay between his plea and sentencing.  The June 19,

28   2007 judgment adjudicated Mr. Khamooshpour guilty of the two counts to which he pled and

sentenced him to five years probation and a fine of $20,000. His probation was terminated after less than two years, on April 29, 2009, due to Mr. Khamooshpour's good performance during his supervised release and as a probationer

## C.   Other Factors Relating to Mr. Khamooshpour's Moral Character

### 1. Acts Outside the Statutory Period

Three prior encounters with law enforcement officials were also raised as relevant to Mr. Khamooshpour's moral character determination. These incidents all occurred prior to the statutory period for establishing good moral character.

In 1980, Mr. Khamooshpour traveled to California to recover a debt owed to his family. During this trip, Mr. Khamooshpour was told that Cholla Vista was a good place to visit for shopping and sightseeing. He claims he went to Cholla Vista and somehow accidentally crossed the border into Mexico. Mr. Khamooshpour had a valid student visa in his passport at the time, and there was nothing unlawful about Mr. Khamooshpour leaving the United States, whether he inadvertently or intentionally crossed the border into Mexico. However, when Mr. Khamooshpour attempted to re-enter the United States at the port of entry in San Ysidro, California, he was denied. United States customs officials informed Mr. Khamooshpour that a presidential order prevented Iranian citizens to re-enter the United States due to the hostage situation in Iran. Mr. Khamooshpour was detained overnight in Tijuana, Mexico. He contacted Ms. Feld, who obtained a lawyer who arranged for Mr. Khamooshpour to be paroled into the United States. An exclusion hearing was scheduled in New York, but Mr. Khamooshpour failed to attend because he and Ms. Feld had been married in the interim and he obtained permanent legal residency.

Mr. Khamooshpour also reported an incident where he was detained by the police in Iran in 1984. Mr. Khamooshpour testified that he traveled to Iran to collect $100,000 that was owed to his family's money exchange business. While Mr. Khamooshpour claims the police initially attempted to assist him in collecting the debt, he also admitted that currency trading and his family's business was illegal in Iran. Mr. Khamooshpour was detained by the Iranian police for two months. Mr. Khamooshpour has alternatively characterized this

1  incident as an "arrest" and as a "protective detention," although both his naturalization

2  application and his presentence report characterize the incident as an arrest. He was released

3  after the Iranian government seized $100,000 from his family's business.

4       The final incident relates to Mr. Khamooshpour's two-month detention on a contempt

5  of court charge in 1990. Mr. Khamooshpour owned an apartment building at 1790

6  Amsterdam Avenue, New York, New York, 10031. He purchased the building in 1985 with

7  the intention of renovating it. He attempted to convince all of the tenants to move out, and

8  all but one person moved out of the building. The remaining individual filed a civil suit

9  against Mr. Khamooshpour for failure to comply with various housing code requirements.

10 Mr. Khamooshpour was ordered by the civil court of the city of New York to make various

11 improvements and repair the hazardous conditions in the building. Having failed to fulfill

12 the court's order after one year, the court held Mr. Khamooshpour in contempt. Mr.

13 Khamooshpour served twenty days in jail, and was assessed civil penalties totaling

14 $725,000, although he was not ultimately required to pay that amount. A settlement was

15 eventually reached, and Mr. Khamooshpour was released.

16              **2.      Testimony of Character Witnesses**

17      Five witnesses testified on Mr. Khamooshpour's behalf at the evidentiary hearing.

18 According to all of these witnesses, Mr. Khamooshpour is an upstanding person of good

19 moral character.

20      Anthony DePrima, who has known Mr. Khamooshpour socially and professionally

21 for over ten years, testified that Mr. Khamooshpour is honest, trustworthy, and would make

22 a good addition to the United States. Herman Dreier testified that he has known Mr.

23 Khamooshpour for ten years, as both a friend and business colleague. Mr. Dreier said that

24 Mr. Khamooshpour is very calm, reliable, courteous, fair and honest. Lorraine Kendall was

25 a tenant of Mr. Khamooshpour's for two years; she testified that their landlord/tenant

26 relationship grew into a friendship, and that she finds Mr. Khamooshpour to be helpful,

27 friendly, and understanding. Baron Benham, a business acquaintance and friend, has known

28 Mr. Khamooshpour for approximately eight years. He testified that Mr. Khamooshpour is

1  nice, sincere, and well-regarded by those in his acquaintance.  Finally, Dr. Michael Maxwell,

2  a cardiologist and tenant of Mr. Khamooshpour's, testified that Mr. Khamooshpour is kind,

3  honest, and compassionate.  He further stated that as landlord, Mr. Khamooshpour was very

4  responsive to requests and often went beyond what was required of a landlord in assisting

5  his tenants, including one incident where Mr. Khamooshpour responded to a problem with

6  the septic system in the property Dr. Maxwell rented.

7       While all of the character witnesses uniformly reported that Mr. Khamooshpour is

8  fair, honest, calm, reliable, and trustworthy, none of the witnesses reported knowing the

9  specific details underlying Mr. Khamooshpour's 2007 conviction.

10  **II.    Conclusions of Law**

11       "No alien has the slightest right to naturalization" unless he strictly complies with all

12  statutory requirements. *Fedorenko v. U.S.*, 449 U.S. 490, 506 (1981) (quoting *United States*

13  *v. Ginsberg*, 243 U.S. 472, 474-75 (1917)).  The applicant for naturalization carries the

14  burden of proving his "eligibility for citizenship in every respect[.]"  *Berenyi v. Dist.*

15  *Director,* 385 U.S. 630, 637 (1967) (internal marks and citations omitted).  Any doubts about

16  an applicant's eligibility for citizenship "should be resolved in favor of the United States and

17  against the claimant." *Id.*

18       **A.    Legal Standard**

19       To be eligible for naturalization, an applicant must establish certain residency

20  requirements, physical presence in the United States for a requisite period, and a showing of

21  good moral character.  *See* 8 U.S.C. § 1427. The only contested issue here is Mr.

22  Khamooshpour's ability to demonstrate his good moral character for the relevant statutory

23  period, which runs from the five years immediately preceding the filing of his naturalization

24  application until the oath of allegiance is administered.  *See* 8 C.F.R. § 316.10(a)(1); *United*

25  *States v. Dang,* 488 F.3d 1135, 1139 (9th Cir. 2007). The Court must "evaluate claims of

26  good moral character on a case-by-case basis," considering certain statutory restrictions and

27  "the standards of the average citizen in the community of residence."  8 C.F.R. §

28  316.10(a)(2).  The Court must make a determination regarding the applicant's moral

character during the statutory period, but it "may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to [the statutory period]." 8 C.F.R. § 316.10(a)(2).

While Congress has not "specifically define[d] what 'good moral character' is," *United States v. Jean-Baptiste*, 395 F.3d 1190, 1193 (11th Cir. 2005), it has established certain standards for determining when an applicant for naturalization cannot be found to have the requisite "good moral character." *See* 8 U.S.C. § 1101(f). For example, Congress determined that any person who is a habitual drunkard, whose income is derived principally from illegal gambling activities, or who has been convicted of an aggravated felony shall be found to lack good moral character, and is accordingly ineligible for naturalization. *Id.* Additionally, 8 U.S.C. § 1101(f)(9) contains a "catch-all" provision, which provides, "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

Pursuant to the authority granted by Congress in this catch-all provision, the Attorney General issued regulations which provide additional criteria for when a naturalization applicant shall be found to lack good moral character. *See* 8 C.F.R. § 316.10. These regulations are entitled to deference, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) (noting that "if Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation"), and have been upheld as a reasonable interpretation of the statutory requirement of good moral character and not ultra vires to the governing statute. *See Dang,* 488 F.3d at 1140-41; *see also Jean-Baptiste*, 395 F.3d at 1194 (collecting cases).

8 C.F.R. § 316.10 provides that an applicant "shall be found to lack good moral character" if, for example, he committed and was convicted of one of more crimes involving moral turpitude, other than a purely political offense, or if he committed and was convicted of two or more offenses where the aggregate sentence actually imposed was five years or more. 8 C.F.R. §§ 316.10(b)(2)(I) and 316.10(b)(2)(ii). Pertinently here, the regulations also

contain a broader, catch-all provision:

> Unless the applicant establishes extenuating circumstances, the applicant *shall be found to lack good moral character* if, during the statutory period, the applicant:
> . . .
> Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b) (1) or (2).

8 C.F.R. § 316.10(b)(3)(iii) (emphasis added).  If an applicant falls within one of the statutory categories that requires that an applicant "shall be found to lack good moral character," he is precluded from establishing his good moral character and is accordingly ineligible for naturalization.

### B.   Mr. Khamooshpour is Precluded From Establishing His Good Moral Character under 8 C.F.R. § 316.10(b)(3)(iii)

Mr. Khamooshpour filed his naturalization application on February 26, 2007.  The statutory period for establishing his good moral character thus began on February 27, 2002. The government contends that Mr. Khamooshpour is precluded from establishing good moral character because, under 8 C.F.R. § 316.10(b)(3)(iii), his 2007 conviction was for unlawful acts that adversely reflect on his moral character.  The Court agrees, and concludes that Mr. Khamooshpour's 2007 conviction bars him from establishing his good moral character for the requisite statutory period.  He is therefore ineligible for naturalization at this time.

Under 8 C.F.R. § 316.10(b)(3)(iii), a conviction during the statutory period for an unlawful act which adversely reflects on the applicant's moral character requires a finding that the applicant lacks good moral character, unless the applicant can present extenuating circumstances.[1]  It is undisputed that Mr. Khamooshpour's 2007 conviction falls within the

---

[1]It is true, as Mr. Khamooshpour argues, that because Mr. Khamooshpour did not commit the crimes underlying his 2007 conviction during the statutory period, he cannot be automatically be precluded from a finding of good moral character under 8 U.S.C. § 1101(f)(3) or 8 C.F.R. §§ 316.10(b)(2)(i) and (ii).  However, under 8 C.F.R. § 316.10(b)(3)(iii), it is enough to bar a finding of good moral character that the *conviction* occurred during the statutory period; the underlying crime itself does not have to have been committed during the statutory period. Mr. Khamooshpour's 2007 conviction clearly falls within the statutory period, even though the crimes underlying his conviction occurred prior to the statutory period.

1   relevant statutory period and that the felonies underlying his conviction constitute "unlawful
2   acts." *See, e.g.*, *United States v. Lekarczyk*, 354 F. Supp. 2d 883, 887 (W.D. Wis. 2005)
3   (noting that the "mere fact [that the crimes for which naturalization applicant was convicted]
4   are crimes makes commission of those acts illegal"). Further, courts interpreting the meaning
5   of "extenuating circumstances" in 8 C.F.R. § 316.10(b)(3)(iii) have found that any
6   extenuating circumstances presented by the applicant must pertain to the applicant's
7   "culpability for [his] crime" and to "the reasons showing lack of good moral character,
8   including acts negating good character, not to the consequences of these matters, including
9   the consequence of denaturalization." *Jean-Baptiste*, 395 F.3d at 1195 (collecting cases).
10   Mr. Khamooshpour did not put forward any evidence of extenuating circumstances relating
11   to his culpability for his underlying crimes; all of the evidence he presented related instead
12   to his rehabilitation.

13          The key issue is thus whether Mr. Khamooshpour's 2007 conviction, and the crimes
14   underlying that conviction, "adversely reflect" upon his moral character. The regulation does
15   not define the phrase "adversely reflect upon the applicant's moral character," nor has that
16   phrase been thoroughly examined in the case law. Mr. Khamooshpour argues that in order
17   to "adversely reflect" on an applicant's moral character, the "unlawful act" must be a crime
18   involving moral turpitude. However, Mr. Khamooshpour has not provided the Court with
19   any case law, nor has the Court found any, to support this interpretation of the regulation.
20   Rather, case law suggests that Congress delegated authority to pass additional regulations,
21   including 8 C.F.R. § 316.10(b)(3)(iii), for the purpose of "cover[ing] non-moral turpitude
22   crimes[.]" *United States v. Okeke*, 671 F. Supp. 2d 744, 751 (D. Md. 2009) (citing *Jean-*
23   *Baptiste*, 395 F.3d at 1194)). The government, in turn, does not advocate for a bright-line
24   rule that all felony crimes or convictions should necessarily be found to reflect adversely on
25   an applicant's moral character. Rather, it argues that in these circumstances, the crimes for
26   which Mr. Khamooshpour was convicted in 2007 reflect adversely on his moral character
27   and thus require a finding that he lacks good moral character under 8 C.F.R. §
28   310.10(b)(3)(iii).

The plain meaning of 8 C.F.R. § 310.10(b)(3)(iii) encompasses Mr. Khamooshpour's conviction and leads to the conclusion that he is precluded from establishing the requisite good moral character. Further, reading 8 C.F.R. § 310.10(b)(3)(iii) in light of the regulation as a whole, it is apparent that this provision is necessarily broader than Mr. Khamooshpour contends. Indeed, 8 C.F.R. § 316.10(b)(2)(i) explicitly deals with crimes involving moral turpitude:

> An applicant shall be found to lack good moral character if during the statutory period the applicant:
> (i) Committed one or more crimes involving moral turpitude, other than a purely political offense, for which the applicant was convicted . . . .

8 C.F.R. § 316.10(b)(2)(I). Although this provision requires the crime involving moral turpitude to have been both committed during the statutory period and resulted in a conviction, and would thus not be wholly duplicative if 8 C.F.R. § 316.10(b)(3)(iii) were read to mean only crimes involving moral turpitude, this section does provide evidence that the regulations were drafted with distinctions between crimes involving moral turpitude and other crimes in mind. It is therefore reasonable to presume that, because 8 C.F.R. § 316.10(b)(3)(iii) employed the broader phrase "unlawful acts that adversely reflect upon the applicant's moral character" as opposed to "crimes involving moral turpitude," it is meant to apply to a broader scope of unlawful activity. *See also Agarwal v. Napolitano*, 663 F. Supp. 2d 528, 542 (W.D. Tex. 2009) (noting that section 3 is "broader than [sections 1 and 2] for two reasons–it includes more types of conduct, and it does not *require* a conviction, though bad conduct not covered by the other regulations and proved through a conviction can be brought in under this regulation" (citing *Dang*, 488 F.3d at 1141)). The Court therefore concludes that an "unlawful act" under 8 C.F.R. § 316.10(b)(3)(iii) does not necessarily have to be a crime involving moral turpitude in order to reflect adversely on an applicant's moral character.

Nor does the Court conclude that all felonies or felony convictions would necessarily reflect adversely on a person's moral character. If that had been Congress's intention, it likely would have used the term "felony" instead of the more amorphous "unlawful acts

- 11 -

which reflect adversely on a person's moral character."  Rather, the circumstances of each crime or conviction must be considered on a case-by-case basis to determine whether the commission of or conviction for a particular crime actually reflects adversely on an applicant's moral character. *See, e.g.*, *Lekarczyk*, 354 F. Supp. 2d at 887 (finding bank fraud, forgery-uttering and bail jumping to be unlawful acts which adversely reflected on naturalization applicant's moral character under 8 C.F.R. § 316.10(b)(3)(iii)).

Turning to the facts of this case, the Court concludes that Mr. Khamooshpour's 2007 conviction for violating the Embargo Act and failing to report foreign financial accounts does reflect adversely on his moral character, and thus precludes Mr. Khamooshpour from eligibility for naturalization under his current application.  Mr. Khamooshpour's "unlawful acts" are not so easily categorized as innocuous, *malum prohibitum* regulatory offenses, as Mr. Khamooshpour attempts to do.  Instead, they reflect a knowing disregard of the law by Mr. Khamooshpour.  The essential elements of violating the Embargo Act are listed in Mr. Khamooshpour's plea agreement as willfully violating the United States embargo of Iran by providing a money remittance service channeling funds to and from Iran without a license from the Office of Foreign Assets Control.  The essential elements of failing to report a foreign financial account are that Mr. Khamooshpour had a financial interest in a financial account in a foreign country, which exceeded $10,000 in value, which he knowingly and willfully failed to report.  To willfully disregard these laws and channel millions of dollars between Iran and the United States reflects poorly on Mr. Khamooshpour's moral character. His claims that it simply did not occur to him that his financial accounts in Iran were "foreign" and that he needed to report them strain credulity.  Mr. Khamooshpour is an intelligent individual, having earned a degree in physics, and he is a sophisticated businessman.  This is a highly regulated area, and the Court finds it unlikely that Mr. Khamooshpour was unaware his operations violated law.  Indeed, his presentence report confirms that he knew he needed a license to operate his money exchange business, and that he knew he did not have the license he needed when he ran the business.  Violating these laws is more than just a mild regulatory offense.  Rather, these laws represent United States

foreign policy and national security being pursued through economic means, and their willful disregard by Mr. Khamooshpour reflects adversely on his moral character.

### C. Mr. Khamooshpour's Other Evidence of Good Moral Character Does Not Overcome His Preclusion under 8 C.F.R. § 316.10(b)(3)(iii)

The Court agrees that Mr. Khamooshpour's other three prior encounters with law enforcement discussed above, in themselves, do not reflect adversely on his present moral character. All of these incidents occurred more than twenty years ago, and Mr. Khamooshpour has shown specific rehabilitation with respect to his performance as a landlord. However, a more telling reflection on Mr. Khamooshpour's present moral character is the fact that his responses on cross-examination regarding these incidents were evasive and sometimes not credible. Mr. Khamooshpour's lack of complete candor does not aid his claim of good moral character.

It is also true that Mr. Khamooshpour's character witnesses lend support to his application. While the Court credits the testimony of Mr. Khamooshpour's character witnesses, their evidence regarding Mr. Khamooshpour's personal characteristics simply does not meet the force of his 2007 conviction, especially considering that the character witnesses did not know the details of his conviction or underlying crimes. Similarly, Mr. Khamooshpour's good performance during his supervised release and his early probation, and the fact that his probation was terminated early, also reflect well on his present moral character. However, this evidence too is simply not enough to overcome his 2007 conviction and preclusion under 8 C.F.R. § 316.10(b)(3)(iii).

## III. Conclusion

For all of these reasons, the Court concludes that Mr. Khamooshpour's 2007 conviction precludes him from a finding of good moral character under 8 C.F.R. § 316.10(b)(3)(iii). Because he is unable to establish his good moral character, Mr. Khamooshpour is ineligible for naturalization and his application must be denied.

1    IT IS THEREFORE ORDERED that Plaintiff's application for naturalization is

2  denied.  The Clerk shall enter judgment against Plaintiff and shall terminate this case.

3    DATED this 14th day of February, 2011.

4

5    _____

6                    Neil V. Wake
                United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28